**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION**

| | | |
|---|---|---|
| WILLIAM HUGGINS and | ) | |
| HOBERT KEITH MILLER, individually and | ) | Case. No. 3:22-cv-135 |
| on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CLASS ACTION |
| v. | ) | COMPLAINT |
| | ) | |
| ABK TRACKING, INC.; ABK ALARMS, INC.; | ) | AND DEMAND FOR |
| ABK REMOTE DRUG TESTING, INC.; | ) | JURY TRIAL |
| DAVID KIELY, in his official capacity as | ) | |
| VANDERBURGH COUNTY FIRST JUDICIAL | ) | |
| CIRCUIT JUDGE; and VANDERBURGH | ) | |
| COUNTY, INDIANA, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.     Vanderburgh County, Indiana conspires with a private, for-profit corporation known as ABK[1] to extort money from poor residents.

2.     On a handshake — with no written contract — Vanderburgh County Circuit Court Judge David Kiely has given ABK, which is run by Kiely's friend Danny Koester, exclusive control over electronic monitoring and drug/alcohol testing for both pretrial and sentenced defendants.

3.     That exclusive control means that ABK is allowed to set and charge exorbitant fees for electronic monitoring and drug/alcohol testing, and, in collaboration with Vanderburgh County police and courts, jail those who cannot afford its fees.

---

[1] ABK's three legal entities will be collectively referred to throughout as "ABK" and "Defendant ABK," unless otherwise specified.

4.      This pay-or-jail scheme is designed for Defendants' financial gain. ABK profits from every person placed on electronic monitoring and/or drug/alcohol testing. ABK also sends a portion of its profits back to Judge Kiely; the money is used to pay for probation staff salaries and court expenses.

5.      Vanderburgh County, Judge Kiely, and ABK are aware that many criminal defendants cannot afford ABK's exorbitant fees, yet they allow this wealth-based extortion scheme to continue anyway. Defendants have created a "justice" system that funnels predominantly poor people through to extract as much wealth as possible from them, then jails them when they run out of money. The resulting debtors' prison criminalizes poverty and damages public safety, all for the financial gain of the County and a private corporation.

6.      As a result of Vanderburgh County's, Judge Kiely's, and ABK's unconstitutional arrangement, Plaintiffs request a preliminary injunction and permanent injunction to enjoin Defendant ABK from charging pre- and post-trial fees and to enjoin all Defendants from incarcerating anyone for non-payment of those fees. Plaintiffs also request damages from Defendant ABK for the unconstitutional fees Plaintiffs and the putative class were and continue to be forced to pay.

**PARTIES**

7.      Plaintiff William Huggins is a male adult resident of Evansville, Indiana. Plaintiff Huggins is currently subject to ABK fees as a condition of his probation. He has paid thousands of dollars in fees to date. ABK has repeatedly requested that Plaintiff Huggins' community placement be revoked due to his inability to afford ABK fees.

8.      Plaintiff Hobert Keith Miller (Keith) is a male adult resident of Evansville, Indiana. Plaintiff Miller is currently subject to ABK fees as a condition of his pretrial supervision. He has paid hundreds of dollars in fees to date, even though he is legally innocent.

9.      Defendant ABK Tracking, Inc. is a private, for-profit company organized as a domestic corporation under Indiana law with its principal office in Evansville, Indiana. The president of ABK is Danny Koester. ABK is privately held, and all stock is owned by Mr. Koester, his wife, his daughter, and his son-in-law. The vast majority of ABK's business comes from fees it charges to criminal defendants in Vanderburgh County, where it has operated since approximately 2007.

10.      Without a written contract and without a competitive bidding process, Judge Kiely has hired ABK as the sole provider of electronic monitoring and drug and alcohol testing for adult criminal court matters.

11.      ABK operates under color of law in Vanderburgh County to enforce electronic monitoring and drug and alcohol testing conditions, including the requirement to pay whatever fees ABK sets.

12.      Operating under color of law in Vanderburgh County, ABK coordinates with local law enforcement to arrest and detain defendants who cannot pay ABK's fees.

13.      Operating under color of law in Vanderburgh County, ABK files reports requesting revocation of defendants' bail and/or community placement for non-payment of ABK's fees.

14.      Operating under color of law in Vanderburgh County, ABK denies electronic home detention (house arrest plus electronic monitoring) as a sentencing option to those who cannot afford it.

15.    Defendant ABK Alarms, Inc. is a private, for-profit company organized as a domestic corporation under Indiana law with its principal office in Evansville, Indiana. The president of ABK Alarms, Inc. is Danny Koester. ABK Alarms, Inc. is privately held, and all stock is owned by Mr. Koester, his wife, his daughter, and his son-in-law. ABK Alarms, Inc. is the parent company for ABK Tracking, Inc. and ABK Remote Drug Testing, Inc. Employees of ABK Tracking, Inc. are paid through ABK Alarms, Inc.

16.    Defendant ABK Remote Drug Testing, Inc. is a private, for-profit company organized as a domestic corporation under Indiana law with its principal office in Evansville, Indiana. The president of ABK Remote Drug Testing is Danny Koester. ABK Remote Drug Testing is privately held, and all stock is owned by Mr. Koester and his wife. As the name implies, ABK Remote Drug Testing provides drug testing that can be done remotely, such as in a supervisee's home.

17.    Defendant David Kiely is a Circuit Court Judge for Vanderburgh County.

18.    Judge Kiely also oversees the county's probation department; Cherie Wood, the chief probation officer, reports directly to Judge Kiely.

19.    Kiely is a county policymaker and administrator, as both head of the probation department and the architect of the ABK policy. According to the Office of Court Services, Judge Kiely is responsible for creating the plan by which the county is certified to provide pretrial services. Vanderburgh County Commissioners have taken the position that Vanderburgh County judges have exclusive authority to set court policies. Judge Kiely is thus sued in his official capacity as a county policymaker and administrator, for his role in hiring ABK — via a no-bid, exclusive, unwritten deal — to provide electronic monitoring and drug and alcohol testing for adult criminal court matters and for his role in overseeing and implementing this deal.

4

20.    As part of his policymaker and administrative role, Judge Kiely is also responsible for creating and approving the forms that ABK uses when supervising Vanderburgh County criminal defendants.

21.    ABK owner Danny Koester and Judge Kiely are friends.

22.    Judge Kiely has rejected at least one proposal from a different company (Total Court Services) that would have not only provided the same services at a lower cost, but that also would have used collected fees to offset the costs for those who cannot afford the fees, rather than, as Judge Kiely has authorized with ABK, using fees to fund the salaries of probation department staff and court operations.

23.    Because Judge Kiely oversees the probation department and because ABK pays Judge Kiely for every person assigned to ABK, Judge Kiely, in his official capacity, has a financial stake in ABK's operations.

24.    Judge Kiely has created, adopted, and acquiesced in a county policy of criminalizing poverty.

25.    Defendant Vanderburgh County is a county in the state of Indiana. Through Judge Kiely, Defendant Vanderburgh County has contracted with ABK to be the exclusive vendor for electronic monitoring and drug and alcohol testing for adult defendants at both the pretrial and sentenced stages of criminal matters. Defendant Vanderburgh County is aware of Judge Kiely's arrangement with ABK and the County Commissioners have chosen thus far to not intervene. Thus Defendant Vanderburgh County has adopted and acquiesced in a county policy of criminalizing poverty, perpetuating cycles of debt and unlawful incarceration.

26.    Under *Ex parte Young*, 209 U.S. 123 (1908), Judge Kiely may be sued in his official administrative capacity and can be enjoined from violating federal law.

27.    Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), Vanderburgh County, its courts, its police forces, and its probation office are liable for their unconstitutional policies and practices. *See also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (holding that *Monell* liability can be shown through an official policy, an informal custom, or the actions of a person authorized to act on behalf of the government entity). The County's delegation of electronic monitoring and drug testing functions to a for-profit company with a financial interest in each of its supervisees violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

28.    ABK is also liable under *Monell* for the constitutional violations it engages in while "acting under color of state law as a contractor performing the public function of running [pretrial and probation conditions]." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 n. 1 (7th Cir. 2004); *see also Shields v. Ill. Dept. of Corr.*, 746 F.3d 782 (7th Cir. 2014) (noting every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). ABK is therefore "treated the same as a municipality for purposes of Section 1983" liability. *Woodward*, 368 F.3d at 927 n. 1; *see also Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity.").

29.    Plaintiffs have been and continue to be harmed by Defendants' unjust and unlawful fee scheme and therefore bring this challenge to enjoin the operation of it.

## JURISDICTION AND VENUE

30.    The Court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4) because this suit presents a federal question and seeks relief pursuant

to federal statutes providing for the protection of civil rights. This suit arises under the Due Process and Equal Protection Clauses of the United States Constitution and 42 U.S.C. § 1983.

31.    The Court has personal jurisdiction over Vanderburgh County and its officers because Vanderburgh County is an Indiana county.  The Court has personal jurisdiction over County and State officers for their acts within Indiana.

32.    Because Vanderburgh County is a Defendant and the majority of the actions challenged in this complaint occurred in Vanderburgh County, jurisdiction is proper in the Evansville Division of the United States District Court for the Southern District of Indiana. Civil L.R. 3-2(c)-(d).

33.    Venue is proper in the Evansville Division of the United States District Court for the Southern District of Indiana, pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

### A.    Defendants Have Adopted a Policy of Extorting Criminal Defendants and Jailing Them for Non-Payment

#### a.    Vanderburgh County Court Structure

34.    Vanderburgh County has two criminal courts: Superior and Circuit. Superior Court is a county court. Ind. Code §§ 33-33-82-5, 7. Circuit Court is the First Judicial Circuit Court for the State of Indiana, encompassing Vanderburgh County. Ind. Code § 33-33-82-2.

35.    Superior Court has two judges: Wayne Trockman and Robert Pigman. These two judges can jointly appoint and remove five Superior Court magistrate judges. Ind. Code §§ 33-33-82-5, 6.

36.    The judge of Circuit Court is an elected position. Ind. Code § 33-28-2-1. Judge David Kiely is the judge of Circuit Court. Below Judge Kiely are three Circuit Court magistrate

judges: Kelli Fink, Celia Pauli, and Ryan Reed. Judge Kiely has authority to appoint and remove Circuit Court magistrate judges. Ind. Code § 33-33-82-3.

37.     Judge Kiely also oversees the probation department, which, in tandem with ABK, supervises criminal defendants sentenced to probation.

> **b.    ABK Fees Begin at the Pretrial Stage, Upending the Presumption of Innocence and the Presumption of Bail**

38.     Typically, when someone is arrested in Vanderburgh County, they are booked at the county jail and only released if they pay bail or if the court releases them on their own recognizance without bail.

39.      Indiana law requires the release of all pretrial arrestees upon "sufficient sureties," and thus presumes the availability of bail, except for charges of murder and treason. *See* Ind. Const. art. 1, § 17; *see also Fry v. State*, 990 N.E.2d 429, 434 (Ind. 2013) ("The right to freedom by bail pending trial is an adjunct to that revered Anglo–Saxon aphorism which holds an accused to be innocent until his guilt is proven beyond a reasonable doubt. . . . Unless that right is preserved, the presumption of innocence, secured only after centuries of struggle, will lose its meaning.") (internal quotations and citations omitted).

40.     Indiana statute and court rule guidelines also require pretrial defendants to not be charged fees if they cannot afford them and to not be incarcerated for inability to pay. *See* Ind. Code § 35-33-8-3.3; Indiana Pretrial Rules § 13.

41.     Even though bail is presumed under Indiana law for the vast majority of defendants and no one is supposed to be incarcerated for inability to pay, Defendants Vanderburgh County and Kiely have authorized the imposition of additional pretrial release conditions and fees on top of bail without considering ability to pay.

42.     Defendants have created a system whereby pretrial arrestees must not only pay bail to get out of jail, but must also pay ongoing fees to ABK to *stay* out of jail.

c.     **ABK Charges Exorbitant Fees, Which It Sets at Its Own Discretion**

43.     Judge Kiely describes the owner of ABK, Danny Koester, as a friend. Ex. 1, Courier & Press Article Oct. 25, 2021.

44.     Judge Kiely authorized an exclusive, no bid, unwritten contract with ABK to designate ABK as the sole vendor for electronic monitoring and drug and alcohol testing for both pretrial and sentenced criminal defendants, including probationers (collectively referred to as "supervisees") in county criminal courts.

45.     Vanderburgh County does not pay anything to ABK for this arrangement.

46.     ABK finances itself by charging fees directly to supervisees for electronic monitoring and drug and alcohol testing.

47.     ABK then shares a portion of the fees with Vanderburgh County. Vanderburgh County uses the money to finance the salaries of probation department staff. This kickback is known as an "administrative fee," and essentially functions as a referral fee the County receives from each "customer" it sends to ABK.

48.     ABK's business with Vanderburgh County is lucrative and vital to its existence. According to ABK owner Danny Koester, an estimated 90–95% of ABK's business comes from Vanderburgh County courts. Ex. 2, Excerpt from Deposition Transcript of Danny Koester in *State of Indiana v. Hillgoth*, Vanderburgh Superior Court (Jan. 25, 2021).

49.     ABK's business with Vanderburgh County is also lucrative to the county. For example, from 2017–2021, more than half of a supplemental fund used to pay for probation salaries (*see* Ind. Code § 35-33-8-3.3(f) & (g)) came from ABK kickbacks, amounting to over $400,000.

50.     ABK has discretion to charge as much as it wants in fees. In the words of Judge Kiely, "I don't tell [Danny Koester, head of ABK] what to charge. It is a private company, and I'm obviously aware of what (the fees) are." Ex. 1, Courier & Press Article Oct. 25, 2021.

51.     ABK's current rates for supervisees are:

- $300 set-up fee for electronic monitoring plus $112 per week thereafter;

- $100 set-up fee for drug & alcohol testing plus $25–35 per test; and

- $7 per day for alcohol testing, six days per week

52.     Weekly fees are not pro-rated; supervisees are responsible for the full amount regardless of when they start conditions.

53.     Supervisees are not informed of these fees until they meet with their ABK or probation officer. Court orders do not specify the fee amounts, nor do judges discuss the fees.

54.     Supervisees can be on multiple conditions at once, such as having to be on electronic monitoring plus drug testing. Thus, *at a minimum*, ABK would charge that person $400 in set-up fees plus $568/month in ongoing fees ($112/week for electronic monitoring and $30/drug test, assuming one drug test/week).

55.     ABK's fees are exorbitant and far outside the reach of the indigent persons who compose the majority of supervisees in Vanderburgh County courts, including Plaintiff Huggins.

56.     Indiana's minimum wage is $7.25/hr. Assuming a person works full-time at minimum wage, they earn $1,160/month pre-tax. Electronic monitoring alone — at a cost of $112/week, or $448/month, not to mention the $300 set-up fee — is close to 40% of that person's pre-tax income.[2]

---

[2] The burdens of being a low-income worker on ABK supervision are many. ABK also requires that all probationers submit a weekly work schedule, which can only be submitted M-Th between 7am and 3pm. Probationers must also provide at least a two-hour notice for all same-day schedule changes, a nearly impossible feat for anyone working in

57.    As another example, if a person is subject to electronic monitoring plus drug testing twice per week ($448/month in electronic monitoring fees plus $240/month in drug testing fees = $688/month), that person will be forced to pay about the same in ABK fees as the average rent for a one-bedroom apartment in Vanderburgh County.[3] At one point, Plaintiff Huggins was charged approximately $600/month in ABK fees, nearly as much as his $675/month rent. Ex. 3, Declaration of William Huggins at ¶¶ 6, 24.

58.    ABK also requires that supervisees on electronic monitoring provide a checking account from which fees can be deducted from, further penalizing indigent persons, who are more likely to be unbanked than their wealthier counterparts.[4] If a supervisee does not have a checking account and needs to pay in cash, ABK charges a $35 fee *per payment* to pay in cash. Plaintiff Huggins had to open a checking account to avoid ABK's additional processing fees. Ex. 3, Huggins Decl. ¶ 8.

59.    While ABK requires direct debit for electronic monitoring, ABK requires cash for drug/alcohol testing.

60.    ABK charges different (and lower) rates when the County pays. Although the County pays nothing for the "user funded" contract with ABK, sometimes County staff will

---

the ever-fluctuating businesses of retail, hospitality, food, gig work, and any other field common among low-income workers. Ex. 4, Sample ABK Contract.

[3] The average rental price for a 1-bedroom apartment in Vanderburgh County is approximately $690/month. *Indiana Fair Market Rent for 2021*, Rent Data, https://www.rentdata.org/states/indiana/2021 (last visited Aug. 15, 2022) (listing $670 as the average rental price for 1-bedroom apartments in 2021); *Homes For Rent in Vanderburgh County, IN*, Rental Source, https://www.rentalsource.com/vanderburgh-county-in/ (last visited Aug. 15, 2022) (listing $709 as the average rental price for 1-bedroom apartments in Aug. 2022).

[4] *See, e.g.*, Berkeley Economic Review Staff, *Banking and Poverty: Why the Poor Turn to Alternative Financial Services*, Berkeley Economics Review (April 15, 2019), https://econreview.berkeley.edu/banking-and-poverty-why-the-poor-turn-to-alternative-financial-services/ (describing the reasons why low and moderate income individuals are more likely to be unbanked and rely on alternatives such as cash checking and payday loans); *Reports on the Economic Well-Being of U.S. Households in 2019, Featuring Supplemental Data from April 2020*, Board of Governors of the Federal Reserve System 27–28 (May 2020), https://www.federalreserve.gov/publications/files/2019-report-economic-well-being-us-households-202005.pdf (sharing various findings about unbanked Americans, including the fact that 14% of those with incomes under $40,000 were unbanked).

11

separately contract — and pay for — ABK's services. For example, sometimes the sheriff's department will choose to place pretrial defendants on electronic monitoring to reduce jail crowding. ABK charges the sheriff $12/day, or $84/week, per person for electronic monitoring. In contrast, a supervisee paying for the same service on their own is charged a $300 set-up fee plus $112/week.

61.     The sheriff also has a fund, known as the sheriff's fund, that can be used to partially or wholly subsidize the cost of ABK electronic monitoring for supervisees who cannot afford it. However, this fund is only available to those who ask for it, but since the fund is not offered or advertised, it is difficult, if not impossible, for supervisees to access the fund. Furthermore, the fund is only available for Superior Court supervisees if Superior Court judges authorize its use and only if sufficient funds are available. Circuit Court judges — headed by Judge Kiely — will not authorize the fund's use.

62.     With the narrow exception of the sheriff's fund to subsidize electronic monitoring for Superior Court supervisees, supervisees have no ability to challenge ABK's fees.

63.     ABK not only has discretion over how much it charges, but it also has discretion over how often a person tests, even though ABK has a direct financial interest in every test. Every test means more money for ABK, creating a perverse incentive for ABK to require more testing even if there is no basis besides ABK's financial interest for doing so. Thus ABK could decide that a person subject to electronic monitoring and drug testing must test twice a week, resulting in a *minimum* of $688/month in ABK fees.

64.     ABK has many strategies for maximizing its profits. If a supervisee admits to having used drugs or alcohol before a test is administered, ABK will keep the supervisee's test

money and will not administer the test, setting that person up for revocation for violating their testing conditions.

65.    If a supervisee is a day late in paying for electronic monitoring fees, ABK will charge late fees.

### d.    Defendants Jail Those Who Cannot Pay ABK's Fees

66.    ABK does not consider ability to pay to reduce or waive its fees.

67.    ABK only considers ability to pay as a form of punishment, to either prevent someone from using their "services" or to remove someone from their "services."

68.    ABK will refuse to allow a sentenced defendant to be on electronic home detention (house arrest plus electronic monitoring) if it determines the person cannot afford ABK's fees. *See, e.g.*, Ex. 5, Sample Petition to Revoke from Prosecutor Douglas Brown ("ABK Tracking as[ked] that Mr. Young be removed from EHD [electronic home detention] while in court today since he can not afford it"). When a judge sentences a defendant to the Indiana Department of Corrections, the judge can have the defendant serve that sentence in three ways: straight prison time, work release (the defendant is incarcerated but can leave for certain authorized activities), and/or electronic home detention. Only electronic home detention costs the defendant money, and that money is paid to ABK, which runs electronic home detention.

69.    Not only will ABK refuse to accept a sentenced defendant into electronic home detention if it determines the person cannot afford ABK's fees, but Circuit Court judges — knowing ABK's stance — will also refuse to sentence defendants to electronic home detention if they cannot afford it. Circuit Court judges will not conduct a thorough ability to pay assessment, but rather simply ask defense counsel if the client can afford it.

70.     The result is that indigent defendants sentenced in Circuit Court who could otherwise serve part or all of their sentence in the community via electronic home detention are forced to serve their sentence in prison *because of their poverty*.

71.     Furthermore, prosecutors in Circuit Court will not offer work release as part of a plea agreement (leaving it instead up to the judge to choose that as the sentence) because work release is funded and run by the county, and therefore ABK does not benefit from it. Like Judge Kiely, the head prosecutor for Vanderburgh County, Nick Hermann, is friends with ABK's owner Danny Koester, and is influenced by that personal relationship to direct as much money as possible to ABK.

72.     As another example, ABK threatens supervisees with jail time for non-payment of fees and makes good on its threats. In the words of one ABK probationer, "She [ABK case manager] said [I'll] have to find [the money to pay for testing] or [I'll] go to jail. If [I] don't pay [I] don't get tested and that's a violation." Ex. 6, Courier & Press Article Nov. 4, 2021. During Plaintiff Miller's orientation on how ABK testing works, he was informed that not paying for his tests would mean a warrant would be issued for his arrest. Ex. 7, Declaration of Keith Miller ¶ 6. In a request to revoke a probationer (which would result in the probationer being incarcerated), ABK wrote, "David also has a past due balance with ABK Tracking in the amount of $735.00. ABK Tracking asks that his sentence be revoked." Ex. 8, ABK Violation Report for David Carney. In a petition to revoke Plaintiff Huggins' probation (which would result in Plaintiff Huggins being incarcerated), Prosecutor Douglas Brown wrote that Plaintiff Huggins "didn't have the funds to be tested" and that "ABK Tracking ask that this [Plaintiff Huggins' nonpayment of ABK fees] be addressed by the courts"). Ex. 9, March 29, 2022 Petition to Revoke for Plaintiff Huggins. In another petition requesting revocation, Prosecutor Douglas Brown wrote, "ABK Tracking as[ked]

that Mr. Young be removed from EHD [electronic home detention] while in court today since he cannot afford it." Ex. 5, Sample Petition to Revoke from Prosecutor Douglas Brown.

73.     If a supervisee cannot afford ABK's fees, ABK will call the Evansville Police Department and have the supervisee arrested on site at ABK's Evansville office without any judicial review and often without any notice to the defendant. In 2021, for example, ABK called the Evansville Police Department at least 172 times, resulting in the Evansville Police Department taking 148 people to the county jail and at least 11 of those 148 were jailed for, at least in part, non-payment of ABK's fees.

74.     Judge Kiely is aware of and condones this extrajudicial arrangement; Vanderburgh County courts have collaborated with ABK to create "hold forms" that ABK and police use to arrest people without first obtaining an arrest warrant.

75.     Post-arrest, ABK will attempt to remove the person from its "services" by filing a revocation request with the court if the person is pretrial or notifying probation to file the report if the person is on probation (known as a "petition to remove," or PTR). Ex. 10, March 29, 2022 ABK Violation Report for Plaintiff Huggins.

76.     The probation department will file PTRs requesting revocation of someone's bond for non-payment of ABK's fees. Ex. 11, Sample Petition to Revoke from Probation Officer Warren Hale (listing as a reason for revocation: "The defendant had no test fee at ABK Tracking on 11/22/19 and 11/26/19").

77.     The probation department will routinely use the same language in its revocation request as ABK used in its request to the probation department.

78.     Even if non-payment of ABK's fees was not part of the original list of reasons for calling the Evansville Police Department, the probation department will add any outstanding fee balances to its revocation reports.

79.     The prosecuting attorneys of Vanderburgh County will also file PTRs requesting revocation of someone's bond for non-payment of ABK's fees and will also parrot ABK's language. *Compare* Ex. 9, March 29, 2022 Petition to Revoke for Plaintiff Huggins ("The Defendant [Huggins] was scheduled for a random drug screen March 28, 2022, reported but didn't have the funds to be tested. We gave William another opportunity to report today March 29, 2022, to be tested. He reported but stated he still didn't have the funds. Since William has started with ABK Tracking he has been unemployed and has not scheduled time to look for a job. ABK Tracking ask that this be addressed by the courts. WHEREFORE, the State of Indiana would respectfully request that the Defendant's bond in the above-captioned cause number be revoked.") *with* Ex. 10, March 29, 2022 ABK Violation Report for Plaintiff Huggins; *see also* Ex. 5, Sample Petition to Revoke from Prosecutor Douglas Brown ("The Defendant still has not provided additional funds for ABK Tracking nor reported a bank account to be billed for his home detention after this week. ABK Tracking as[ked] that Mr. Young be removed from EHD [electronic home detention] while in court today since he cannot afford it. The Defendant is unemployed and has not been employed while on ABK Tracking. WHEREFORE, the State of Indiana would respectfully request that the Defendant's bond in the above-captioned cause number be revoked.").

80.     When supervisees finally have a court hearing, county courts do not assess supervisees' ability to pay and routinely rubber stamp the revocation requests, whether they came from ABK directly or from the probation department or prosecutors at the behest of ABK. Thus supervisees are revoked and detained *because of* their inability to pay ABK's exorbitant fees. Had

they been able to afford ABK's fees, ABK would not have had them arrested nor petitioned for their revocation.

81.    Once a supervisee is released again, the courts will routinely order the supervisee back to ABK and order that they pay the fees allegedly owed. If supervisees still cannot pay, the cycle repeats, with supervisees arrested and sent to jail for non-payment of ABK fees.

82.    ABK also requires that drug and alcohol testing fees be paid in advance. If a supervisee cannot pay, ABK will refuse to administer the test.

83.    ABK requires full payment; even if a supervisee can offer partial payment, ABK will refuse to test the supervisee. On one occasion, Plaintiff Huggins was a mere $5 short, yet ABK still refused to let him test. Ex. 3, Huggins Decl. ¶ 9.

84.    All Defendants are aware that for a supervisee who is court-ordered to test, *not* testing is a violation of a supervisee's release conditions, which can result in the person's rearrest and reincarceration. By refusing to administer drug and alcohol tests to those who cannot afford it, ABK sets supervisees up for rearrest and reincarceration.

85.    ABK also threatens supervisees with PTRs if they cannot pay for drug and alcohol tests. ABK will notify supervisees that if they cannot pay for the next drug/alcohol test, ABK will file a PTR, setting supervisees up for rearrest and reincarceration.

86.    ABK is also authorized to send supervisees to jail for failing a drug test, and ABK is not required to first verify if it is a false positive before incarcerating the supervisee. If a supervisee believes the test produced a false positive, they must pay approximately $40 to retest (in addition to the regular $30 testing fee) and they must do so within three days of the original test. In the meantime, ABK will send the person to jail for the (false) positive test, without judicial review.

87.    For a single failed drug test, ABK also has the discretion to increase the frequency of a probationer's drug testing and extend a probationer's conditions for an additional six months, which means an additional six months subject to ABK's fees, jail threats, and jail time.  Ex. 12, Sanctions List for ABK Offender Accountability Program.

88.    ABK fees are also not the only financial burden on criminal defendants in Vanderburgh County. Pretrial defendants are charged bail as well as various pretrial supervision fees, and probationers must pay various fees for set-up, administration, and supervision directly to the probation department, which is also overseen by Judge Kiely. *See* In. Code § 35-33-8-3.3. In addition to ABK fees, Plaintiff Miller must pay $40/month in pretrial supervision fees to the county. Ex. 7, Miller Decl. ¶¶ 7–8.

89.    ABK not only financially gouges supervisees, but acts as though it were law enforcement. Not only does ABK contact the police directly to conduct arrests without court intervention, ABK will also file police reports requesting that "criminal damage to property" charges be filed if a supervisee returns electronic monitoring equipment damaged. Ex. 4, Sample ABK Contract. In its electronic monitoring contracts, ABK also authorizes itself to "make home visits at any time of the day or night." *Id*.

90.    The vast amount of power that Defendants Vanderburgh County and Judge Kiely have given ABK creates an extremely coercive and abusive dynamic between ABK and the people it supervises.

       **e.**      **By Granting ABK a Monopoly, Defendants Vanderburgh County and Kiely Deprive Supervisees of More Affordable and Less Coercive Options**

91.    Defendants Vanderburgh County and Kiely ignore more affordable — and less coercive — options in favor of benefitting Defendant Kiely's friend, ABK owner Danny Koester.

92.     For example, Vanderburgh County's treatment courts and Vanderburgh County's Community Corrections work-release program use a different vendor for drug and alcohol testing, which charges $13 per test. The fees for participants who cannot pay up front are added onto participants' court fees, so that participants can test first and pay later.

93.     Additionally, the Vanderburgh County Juvenile Court contracts with Total Court Services for electronic monitoring services and charges participants a $50, one-time fee.

94.     As another example, neighboring Posey County, Indiana, also contracts with Total Court Services. Total Court Services charges $15 per drug/alcohol test. For electronic monitoring, Total Court Services charges a $100 set-up fee and $70/week. While still exorbitant, a portion of these fees are returned to the Posey County court system to help subsidize the fees for defendants who cannot afford these fees. In contrast, the portion of ABK's fees that ABK returns to the Vanderburgh County court system are used to subsidize probation department salaries.

95.     As another example, neighboring Warrick County, Indiana, leases equipment from Total Court Services and charges $5 for negative tests and $10 for positive tests and $98/week for electronic monitoring.

96.     ABK's fees are thus a ransom imposed on supervisees without due process and under threat of incarceration. Rather than being an alternative to jail, ABK ensures that many supervisees go back to jail. A supervisee's freedom hinges on continuing to pay ABK, which, like a mafioso charging a "protection" fee, threatens harm if supervisees do not pay. The corrupt alliance between Judge Kiely and ABK reveals that the goal of the alliance is not public safety, but money.

**B.     Plaintiffs Are Charged ABK Fees Under Penalty of Incarceration**

97.    Plaintiffs Huggins and Miller must pay ABK fees as a condition of their supervision and thus as a condition of their freedom. Ex. 3, Huggins Decl. ¶¶ 3, 5–6, 10–11, 26; Ex. 7, Miller Decl. ¶¶ 5–6, 10.

98.    Both men are fathers, who have less money and time to provide for their families because of ABK fees. Huggins Decl. ¶ 4, 21, 24, 29; Miller Decl. ¶ 13.

### a.    Plaintiff Huggins

99.    Plaintiff Huggins has been subject to ABK fees as part of both pretrial and post-trial supervision. Ex. 3, Huggins Decl. ¶¶ 2, 28.

100.    While on pretrial supervision from April 2021 to February 2022, Plaintiff Huggins had to pay $30 per drug test once per week to ABK. *Id.* at ¶ 3. Plaintiff Huggins was also charged $60/month in pretrial supervision fees. *Id.*

101.    When Plaintiff Huggins was sentenced to electronic home detention in February 2022, ABK required Plaintiff Huggins to pay a $300 set up fee, plus an ongoing $112 weekly fee plus $35 per drug test (one to two times per week), resulting in an average monthly bill of $600 in ABK fees. *Id.* at ¶¶ 4, 6.

102.    Plaintiff Huggins is indigent and cannot afford ABK's fees. *Id.* at ¶¶ 21–24. When Plaintiff Huggins has not been able to pay, ABK has filed petitions to revoke (PTRs) to end Plaintiff Huggins' community placement. *See, e.g.*, Ex. 9 (March 29, 2022 Petition to Revoke for Plaintiff Huggins) and Ex. 13 (May 17, 2022 Petition to Revoke for Plaintiff Huggins).

103.    Because ABK PTR'd Plaintiff Huggins so many times in such a short period of time, Plaintiff Huggins was temporarily removed from electronic home detention and switched to probation under which he must do random drug tests once per week. Ex. 3, Huggins Decl. at ¶¶ 25–26. However, the court has told Plaintiff Huggins that the plan is to place him back on

electronic home detention, which he cannot afford. *Id.* at 26. As a result, Plaintiff Huggins' supervision has been extended beyond the original end date of August 2, 2022. Ex. 10, March 29, 2022 ABK Violation Report for Plaintiff Huggins.

104.    Just in the three months or so that Plaintiff Huggins was on electronic home detention under ABK, Plaintiff Huggins paid approximately $2,000 in ABK fees. Huggins Decl. at ¶ 22.

105.    Plaintiff Huggins remains on probation to this day, without a current end date to how long he will continue to have to pay ABK. *Id.* at ¶¶ 26–29.

      **b.**    **Plaintiff Miller**

106.    Plaintiff Miller has been on pretrial supervision since June 2022. Ex. 7, Miller Decl. ¶ 2.

107.    Even though Plaintiff Miller was not charged with an alcohol-related offense, he is required to take in-person breathalyzer tests every day, six days a week, at his own expense. *Id.* at ¶¶ 3, 5.

108.    Plaintiff Miller must pay ABK $7 per day in cash for the breathalyzers, resulting in approximately $168 in ABK fees per month, plus another $40 per month for supervision fees. *Id.* at ¶ 10.

109.    In the few months that Plaintiff Miller has been on pretrial supervision, he has already had to pay close to $500 in fees. *Id.* at ¶ 15.

110.    ABK will not allow Plaintiff Miller to test without first paying. *Id.* at ¶ 9. Probation staff informed him that not paying means a warrant would be issued for his arrest. *Id.* at ¶ 6.

111.    Plaintiff Miller remains on pretrial supervision, without having been found guilty of the crime for which he is accused and for which supervision was ordered. *Id.* at ¶ 15.

C.    **Vanderburgh County's Private Fee Extortion Scheme Violates Due Process and Equal Protection**

112.    At "all stages of [criminal] proceedings the Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations." *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). Vanderburgh County, Judge Kiely, and ABK engage in "invidious discrimination" through their extortionate fee scheme.

113.    All Defendants have a financial stake in ABK's fees. As a result, they violate due process because they cannot possibly make neutral determinations regarding conditions when the more conditions imposed and the longer conditions are imposed, Defendants make more money.

114.    Defendants also violate due process by depriving pretrial defendants of their property. Pretrial defendants are innocent under the law, yet they are punished by being forced to pay ABK's fees to stay out of jail.

115.    Defendants' fee scheme is also a form of arbitrary bail, in violation of due process. Criminal defendants must pay ABK's fees to stay out of jail, yet ABK's fees are not subject to the same constitutional parameters required of bail.

116.    Defendants also engage in wealth-based discrimination through their fee scheme. Those who cannot afford ABK's fees are subject to threats, arrest, incarceration, and fewer sentencing options (resulting in further incarceration).

117.    Defendants' fee scheme also creates debtors' prisons, in violation of due process. Those unable to afford ABK's fees land in jail; the deprivation of their liberty is *because of* their poverty.

118.    ABK also falsely imprisons supervisees who cannot afford its fees by having supervisees arrested and detained, without judicial review.

119.    By charging fees to pretrial supervisees and incarcerating those who cannot afford ABK's fees without considering ability to pay, Defendants have conspired to violate Plaintiffs' and putative class members' constitutional rights.

a.    **Defendants' Financial Stake in ABK's Fees Violates Due Process**

120.    The due process clause of the Fourteenth Amendment prohibits neutral judicial officers and law enforcement actors from having a "direct, personal, and substantial pecuniary interest" in the cases they prosecute and supervise. *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927); *see also Ward v. City of Monroeville, Ohio,* 409 U.S. 57, 34 (1972) (holding mayor could not also serve as traffic court judge since traffic court fines were a "major part" of city's income); *Meyer v. Niles Township*, 477 F. Supp. 357 (N.D. Ill. 1979) (holding due process rights of public aid program applicants were violated when committee members who made application decisions were also city supervisors, given that the money for the program came from the city's coffers).

121.    Having a financial interest in the outcome creates an "unacceptably high probability of bias," *Alexander v. Wisconsin Dep't of Health & Fam. Servs.*, No. 99-C-0429-C, 2000 WL 34239243, at *13 (W.D. Wis. May 23, 2000), and is one of the standard reasons for a judge to recuse himself from proceedings. *See United States v. Williams*, 949 F.3d 1056, 1061 (7th Cir. 2020) (discussing forms of judicial bias that are disqualifying).

122.    Financial interests are not the only interests that can create a conflict of interest resulting in violations of due process. *See Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1373 (7th Cir. 1994) ("Of course, the Supreme Court has held the due process clause requires disqualification for interests besides pecuniary interests"). Where there are "'direct, personal and substantial' influences on" the decision makers in question, such that an "average man would find

it difficult, if not impossible, to set the influence[s] aside," an unconstitutional conflict of interest can arise. *Id.* (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986)).

123.    The judges and probation officers of Vanderburgh County are supposed to be neutral public officials. In practice, however, these officials are responsible for enforcing the collection of ABK's fees, from which they financially benefit.

124.    For example, from 2017–2021, ABK paid over $433,000 into a county fund used to pay the salaries of probation officers and probation staff. ABK's contribution accounts for more than half of the money available in the fund during that period.

125.    Vanderburgh County judges and probation officers make decisions about conditions (*e.g.*, whether to place a probationer on electronic monitoring), yet they cannot make those decisions in a neutral manner when a significant portion of the money collected based on those conditions is returned to them, paying for the salaries of the people tasked with enforcement of the fees.

126.    Even if ABK's fees do not pay for judges' salaries, the referral fees that ABK pays go directly into the court's budget to fund the probation department, and Judge Kiely is the head of the probation department. Thus the "principle of disqualification applies even if the pecuniary interest is only an indirect outgrowth of a public official's desire to protect official funds." *Meyer*, 477 F.Supp. at 362.

127.    What is more, every time Judge Kiely assigns a defendant to electronic monitoring and/or drug and alcohol testing, not only do Kiely's employees (probation officers and court employees) directly benefit, but so does his friend Danny Koester, owner of ABK. Every time Judge Kiely assigns a defendant to electronic monitoring and/or drug and alcohol testing, his friend Danny Koester makes money and the salaries of Kiely's probation officers get subsidized. Judge

Kiely, let alone "an average man[,] would find it difficult, if not impossible, to set the[se personal and financial] influence[s] aside" when making decisions about pretrial and sentencing conditions. *Del Vecchio v. Illinois Dep't of Corr.*, 31 F.3d 1363, 1373 (7th Cir. 1994); *see also Hadler v. Union Bank and Trust Co. of Greensburg*, 765 F.Supp. 976 (S.D. Ind. 1991) (holding judge's recusal warranted because, among other reasons, judge was personal friend of non-party witness, judge had a financial interest in case outcome, and witness' credibility mattered and would be determined by the judge).

128.    Judge Kiely can be held liable for this personal and financial conflict of interest because he "'knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment.'" *Meyer*, 477 F.Supp. at 363 (quoting *Butz v. Economou*, 438 U.S. 478, 506–07 (1978)). Judge Kiely and his colleagues can still assign pretrial and sentenced defendants to conditions where appropriate, but not where there is an unconstitutional conflict of interest.

129.    The constitutional prohibition on financial conflicts of interests applies to ABK as well, given that ABK "act[s] under color of state law as a contractor performing the public function of running [pretrial and probation conditions]." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 n. 1 (7th Cir. 2004). ABK is therefore "treated the same as a municipality for purposes of Section 1983" liability. *Id.*

130.    Vanderburgh County, under Judge Kiely's authority, has given ABK discretion to set fees at any level it wants, thus allowing ABK to determine its profits.

131.    Vanderburgh County, under Judge Kiely's authority, has also given ABK discretion to determine how often supervisees test, despite the fact that ABK profits from every single test.

If a supervisee fails a test, ABK has discretion to not only increase the frequency of testing, but also for how long the supervisee will have to test.

132.    ABK cannot make neutral decisions about its fee amounts and how often and how long a supervisee tests when every fee and every test means more profit for itself.

133.    ABK, along with the County, also threatens incarceration and incarcerates those unable to pay ABK's exorbitant fees. Such power further aggravates their conflict of interest; not only do Defendants have a financial stake in every drug and alcohol test and electronic monitoring, Defendants also use incarceration to enforce their financial stake.

134.    While officers of the court on paper, Defendants are profiteers in practice, resembling mafia members who threaten harm (here, incarceration) if payment is not made.

135.    Plaintiffs have a "constitutional right to have [their conditions] decided by . . . unbiased, disinterested" officials. *Meyer*, 477 F.Supp. at 362. Because Defendants deny Plaintiffs' constitutional right to such neutrality because of their financial conflict of interest, Defendants violate the Due Process Clause of the Fourteenth Amendment.

   **b. Defendants Deprive Pretrial Arrestees of Their Property Without Due Process**

136.    Pretrial arrestees have a property interest in the dollar amount of pretrial fees, which routinely amount to hundreds of dollars per month and thousands of dollars over the course of a case. Electronic monitoring alone is $112/week and every single drug test is $30. In the span of just a few months on electronic home detention, Plaintiff Huggins had to pay approximately $2,000 in fees. Ex. 3, Huggins Decl. ¶ 22. In the span of just a few months on pretrial supervision, Plaintiff Miller has had to pay approximately $500 in fees. Ex. 7, Miller Decl. ¶ 15. Both remain subject to ongoing fees amounting to hundreds of dollars per month. Huggins Decl. ¶¶ 26–28; Miller Decl. ¶ 10.

137.    Due process requires that pretrial arrestees be provided with a meaningful opportunity to challenge a deprivation, by a state actor, of their property. *Mathews v. Eldridge*, 424 U.S. 319 (1976). That opportunity must be provided prior to the deprivation, given the important interest at stake, the high likelihood of interim error, the lack of a government interest in delay, and the lack of a meaningful post-deprivation remedy for pretrial arrestees in Vanderburgh County. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56 (1993); *Lolling v. Patterson*, 966 F.2d 230, 234 (7th Cir. 1992); *White v. City of Chicago*, 149 F. Supp. 3d 974, 977–78 (N.D. Ill. 2016) (citing *City of Los Angeles v. David*, 538 U.S. 715, 717 (2003)).

138.    In particular, bail payments imposed prior to trial must meet stringent due process requirements. *See United States v. Salerno*, 481 U.S. 739, 751–52 (1987).

139.    ABK's pretrial fees operate as an extension of bail. To stay out of jail, not only do pretrial arrestees have to pay their bail (where applicable), but they must also pay ABK's fees.

140.    Despite the bail-like nature of ABK's pretrial fees, these fees carry no procedural protections whatsoever, in violation of the Constitution.

141.    First, by imposing these fees on pretrial arrestees, ABK is imposing these fees on individuals who have not been found guilty of anything and who may never be found guilty of anything. In essence, pretrial arrestees in Vanderburgh County are assessed a monetary sanction even though they are presumed innocent.

142.    Second, no Defendant provides an ability to contest these fees. There is no opportunity at the time the fees are imposed or afterwards to waive or reduce the fees, with the narrow exception of the use of the sheriff's fund for electronic monitoring in Superior Court.

143.    Third, these fees are imposed without notice, indefinitely, and without counsel.

144.    Fourth, ABK retains these fees when a pretrial arrestee admits to drug or alcohol use, without then allowing the supervisee to actually test, setting them up for revocation. ABK retains the fees without even offering the "service" for which the fee is assessed.

145.    Fifth, no Defendant provides a meaningful, post-deprivation remedy. Fees are not refunded in the event of an acquittal or dismissal, nor are fees credited towards court fines or probation costs in the event of a guilty verdict or plea. Pretrial supervisees can also be incarcerated for not paying these fees, and there is no way to undo the harm of unlawful incarceration.

146.    Because Defendants do not provide pretrial arrestees with any meaningful, pre-deprivation opportunity to challenge this government deprivation of pretrial defendants' property (the money paid to cover ABK's fees), Defendants violate due process.

> ### c.    ABK's Fees Function as a Form of Arbitrary Bail in Violation of Due Process

147.    In practice, pretrial defendants' bail amounts only serve as a down-payment on their pretrial freedom. ABK's fees are an ongoing extension of their bail; to not only get out of jail, but to also remain out of jail, pretrial defendants must pay ABK's fees.

148.    Otherwise, ABK will threaten pretrial defendants with jail for non-payment and will make good on its threats by having pretrial defendants arrested and taken to the county jail for non-payment. ABK will file "petitions to remove" the person from their roster and revoke the person's bail. Judges can and do revoke pretrial defendants' bail for non-payment of ABK's fees.

149.    Therefore, ABK's pretrial fees are subject to the same constitutional parameters and protections as bail. *Salerno*, 481 U.S. at 751–52.

150.    Yet these fees are imposed without the parameters and protections required under *Salerno*.

151.    Pretrial freedom is the default under Indiana law. Ind. Const. art. 1, § 17. By authorizing ABK to run pretrial release conditions, Defendants Vanderburgh County and Judge Kiely have reversed that presumption.

152.    Defendants Vanderburgh County and Judge Kiely have authorized a pretrial release system whereby pretrial defendants are assigned to ABK without first considering their ability to afford ABK's fees and without providing any alternative to ABK. The only option is ABK and the only alternative to ABK is jail.

153.    Indiana law and Indiana's Pretrial Services Rules (a guide created by trial court judges to standardize pretrial policies and procedures throughout the state) require that a person's ability to pay be assessed before imposing pretrial fees, that pretrial fees be part of a written policy, and that incarceration cannot be a consequence for nonpayment. Ind. Code § 35-33-8-3.3; Indiana Pretrial Services Rules § 13. ABK's fees fail on all of these fronts.

154.    In addition, ABK's fees are assessed until a case is resolved by conviction, plea, acquittal, dismissal of charges, or lapsing of the statute of limitations. Cases vary greatly in how long they take to resolve; pretrial defendants are thus subject to the whims of the cadence of the carceral system — continuances, the timing of plea offers, etc. — to determine their ultimate exposure to fees. Pretrial defendants have no notice of how much they will ultimately face in pretrial fees beyond the set amounts for each week (electronic monitoring fees) or each drug or alcohol test (approximately $30 per test). Unlike bail, which is a fixed amount, pretrial fees are indeterminate because case timelines are indefinite, further violating due process.

155.    Indeed, the pretrial defendant who exercises his constitutional right to present a defense and have a trial is punished for taking the time necessary to prepare his defense and have a trial, because each day that passes comes with additional fees.

156.    In addition, conditions can and frequently do change throughout the course of case (such as an increase in the frequency of drug testing), further varying how much the person is forced to pay.

157.    The arbitrariness with which Defendants impose pretrial fees — under threat of incarceration, divorced from any judicial determination of ability to pay, on top of already-paid bail, and indefinite to the point of infringing on other constitutional rights such as the right to trial — violates due process.

### d.    Defendants Punish Those Unable to Afford ABK's Fees in Violation of Equal Protection

158.    The Fourteenth Amendment's Equal Protection Clause prohibits punishing people (including incarcerating them) simply because they are poor. Hinging a person's liberty on her ability to pay is an unconstitutional form of wealth-based discrimination. *See Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (defendant cannot have his probation revoked for being too poor to pay restitution); *Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full") (quotations omitted); *Williams v. Illinois*, 399 U.S. 235, 244 (1970) (Equal Protection Clause of the Fourteenth Amendment "requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status."); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion) (finding state may not condition criminal defendant's right to appeal on ability to pay for trial transcript because there "can be no equal justice where the kind of trial a man gets depends on the amount of money he has").

159.    Defendants engage in wealth-based discrimination by incarcerating those unable to afford ABK's fees.

160.    This discrimination takes five main forms.

161.    First, ABK, in partnership with local law enforcement, will threaten to arrest and then will arrest and detain supervisees who are unable to afford ABK's fees prior to judicial review.

162.    Second, ABK, sometimes in partnership with the county probation department and prosecutor's office, will file requests for revocation or petitions to remove with the county court to re-incarcerate those who are unable to afford ABK's fees.

163.    Third, Circuit Court judges, under Defendant Judge Kiely's direction, will refuse to use the sheriff's fund to subsidize the cost of electronic monitoring for supervisees who cannot afford it, leaving supervisees to absorb the entire cost of electronic monitoring, at the rate set by ABK.

164.    Fourth, ABK will refuse to administer drug and alcohol tests for those who cannot pay beforehand. Not testing is a violation of release conditions for those court-ordered to test, so ABK's refusal to test those unable to pay ABK's fees results in those supervisees being jailed for violation of their release conditions.

165.    Five, Defendants deny electronic home detention — an alternative to a carceral sentence — as a sentencing option to supervisees unable to afford ABK's fees for electronic home detention. A defendant sentenced to the Indiana Department of Corrections can serve out their sentence in one of three ways: in prison, on work release (they remain incarcerated except for specific authorized activities), or on electronic home detention (house arrest + electronic monitoring). ABK refuses to enroll a defendant in electronic home detention if it determines the person cannot afford ABK's fees and Circuit Court Judges will refuse to sentence a defendant to electronic home detention if they determine the person cannot afford ABK's fees. A defendant who cannot afford ABK's electronic home detention fees will have to serve out their sentence

either entirely or partially behind bars, whereas a defendant who can afford ABK's electronic home detention fees can serve out their sentence at home.

166.    Thus a person's financial status determines whether a person will be incarcerated in Vanderburgh County. Defendants in Vanderburgh County can be incarcerated *because* they are poor.

167.    Such wealth-based discrimination is unconstitutional.

> **e.    Defendants Punish Those Unable to Afford ABK's Fees and Thereby Create Debtors' Prisons in Violation of Due Process**

168.    The Fourteenth Amendment's Due Process Clause also prohibits outcomes in the carceral system from turning on a person's ability to make a monetary payment. *See Bearden*, 461 U.S. at 667; *Tate*, 401 U.S. at 398; *Williams*, 399 U.S. at 244; *Griffin*, 351 U.S. at 19; *Williams v. Adams*, 660 F.3d 263 263, 266 (7th Cir. 2011) ("Inability to pay a fine has been held not to justify the alternative of imprisonment. . . .To ignore a party's inability to pay a sanction could result in a disproportionate punishment").

169.    The right to freedom from detention is fundamental, and the United States Supreme Court has never wavered from the principle that "[f]reedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also Baez-Sanchez v. Kolitwenzew*, 360 F. Supp. 3d 808, 814 (C.D. Ill. 2018) (quoting *Zadvydas*, 533 U.S. at 690); *Lee v. City of Los Angeles*, 250 F.3d 668, 683 (9th Cir. 2001) ("The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction.").

170.    Given this fundamental right to liberty, any attempt to deprive someone of their liberty — including through incarceration for failure to make a monetary payment — is subject to

heightened scrutiny. *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (the due process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests" such as freedom from government detention); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *Salerno*, 481 U.S. at 748 ("compelling" government interests can justify pretrial detention); *Williams*, 399 U.S. at 241– 42 (the "passage of time has heightened rather than weakened the attempts to mitigate the disparate treatment of indigents in the criminal process").

171.    Vanderburgh County's debtors' prisons do not meet this heightened standard. Defendants' imprisonment of supervisees for failure to pay ABK fees is neither narrowly tailored nor serves a compelling government interest. ABK is allowed to charge whatever it wants in fees. ABK is allowed to increase the frequency and length of testing without judicial review. ABK is allowed to detain supervisees who cannot afford its fees without judicial review. There is nothing tailored about this approach, must less "narrowly" tailored. The only interest served is financial: to line ABK's pockets and to pay the salaries of probation staff and the costs of court operations. Vanderburgh County cannot balance its budget by allowing a private corporation to profit off the backs of the County's poorest residents.

172.    Liberty cannot hinge on ability to pay, yet that is exactly how Vanderburgh County's arrangement with ABK operates. By punishing supervisees who cannot afford ABK's fees — through threats, arrests, incarceration, and limiting sentencing options thus resulting in more incarceration — Defendants violate due process.

      f.     **ABK Falsely Imprisons Supervisees by Unlawfully Detaining Them for Failure to Pay ABK's Fees**

173.    Federal courts examine false imprisonment claims by applying state law. *See, e.g.*, *Bentz v. City of Kendallville*, 577 F.3d 776, 779–80 (7th Cir. 2009) (applying Indiana law in discussing false imprisonment).

174.    False imprisonment under Indiana law is the unlawful restraint of a person's freedom of movement or deprivation of a person's liberty without their consent. *See Camm v. Clemons*, 2021 WL 2454447, at *3 (S.D. Ind. June 16, 2021) (quoting *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003)).

175.    When a supervisee cannot afford ABK's fees, ABK will call the police and have that person arrested at ABK's Evansville office. That arrest is done without judicial review and on an unlawful basis — the "crime" is a supervisee's poverty, *i.e.*, their inability to pay ABK's fees. Such unlawful restraint is done without the supervisee's consent.

176.    Such false imprisonment is additionally unlawful in the pretrial context because Indiana law creates a presumption of release in all cases except for charges of murder and treason. Ind. Const. art. 1, § 17. ABK ignores this presumption and falsely imprison supervisees as a result.

177.    Judge Kiely is aware of and condones this extrajudicial arrangement; Vanderburgh County courts have collaborated with ABK to create "hold forms" that ABK and police use to arrest people without first obtaining an arrest warrant.

178.    For detaining supervisees against their will based on an unlawful premise, ABK commits false imprisonment.

g.    **Defendants Conspire to Deprive Plaintiffs of their Constitutional Rights**

179.    "A §1983 conspiracy requires both (1) an underlying constitutional violation and (2) an agreement among the defendants to inflict the unconstitutional harm." *Green v. Howser*, 942 F.3d 772, 778 (7th Cir. 2019).

34

180.    Defendants have conspired to violate the constitutional rights of Plaintiffs and all putative class members, who are criminal defendants in Vanderburgh County.

181.    Defendants have an agreement to force criminal defendants in Vanderburgh County to pay ABK fees under penalty of incarceration, without findings of guilt and without consideration of ability to pay. This agreement is the result of a private, unwritten contract between ABK's president, Danny Koester, and Vanderburgh County Circuit Court Judge David Kiely. Vanderburgh County has acquiesced and endorsed this agreement by authorizing Judge Kiely to make such an agreement as a county policymaker and by profiting from the kickbacks that ABK provides to the County for its exclusive contract.

182.     This agreement violates the due process and equal protection clauses of the Constitution. By charging fees to pretrial supervisees and threatening jail and jailing supervisees for non-payment of ABK fees without considering ability to pay, Defendants "inflict unconstitutional harm."

183.    Defendants have thus conspired to deprive Plaintiffs and criminal defendants in Vanderburgh County of their constitutional rights.

184.    ABK does not escape liability because it is a private corporation. ABK acts under color of law for §1983 purposes because it is a "willful participant in joint action with" government officials. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

**CLASS ACTION ALLEGATIONS**

185.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative of the following class:

> All persons who have been or will be charged fees by ABK as part
> of a criminal matter in Vanderburgh County, Indiana ("main class").

186.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative of the following sub-class:

> All persons who have been or will be charged fees by ABK as a pretrial bond condition of a criminal matter in Vanderburgh County, Indiana ("pretrial subclass").

187.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative of the following sub-class:

> All indigent persons who have been or will be charged fees by ABK as part of a criminal matter in Vanderburgh County, Indiana ("indigent subclass").

188.    Plaintiffs and members of the main class bring forward claims 1 and 7.

189.    Plaintiffs and members of the pretrial subclass bring forward claims 2 and 3.

190.    Plaintiffs and members of the indigent subclass bring forward claims 4, 5, and 6.

191.    Plaintiffs, and others similarly situated, are victims of Defendants' discriminatory policies and practices resulting in illegal detention and illegal collection of fees and have sustained damages as a direct and proximate cause of these violations.

192.    As described below, this action satisfies the prerequisites of numerosity, commonality, typicality, and adequacy of representation required by Fed. R. Civ. P. 23(a)(1)–(4) to proceed as a class action.

193.    Because of the risk of inconsistent adjudications or prejudice to absent class members, as well as the request for injunctive relief and damages, the proposed class also meets the requirements of Rule 23(b)(1), (2), and (3).

**A.    Numerosity — Fed. R. Civ. P. 23(a)(1)**

194.    The persons in the proposed class are so numerous that joinder of all members is impracticable. Although the exact number of class members is unknown to Plaintiffs at this time, it is anticipated that the class is composed of thousands of members.

195.    In October 2021 alone, 750 people were on alcohol and drug testing requirements.

196.    The pretrial subclass is sufficiently numerous because thousands of criminal cases are filed in Vanderburgh County every year, and even if only a small percentage of those were in pretrial status, that number would still be sufficient for numerosity purposes.[5]

197.    The indigent subclass is sufficiently numerous because many, if not the majority of, criminal defendants in Vanderburgh County qualify for appointed counsel.

198.    Ascertainability of the exact number of class and subclass members is readily achievable through analysis of Defendants' records.

**B.      Commonality — Fed. R. Civ. P. 23(a)(2)**

199.    The relief sought is common to all class members: an end to Vanderburgh County's agreement with ABK so as to protect the constitutional rights of Plaintiffs and class members now and in the future.

200.    There are also issues of law and fact common to the class.

201.    Among the common issues of fact are:

    a.    Do Defendants have a financial interest in ABK's fees and the power to affect supervision conditions so as to determine the frequency and amount of the fees (main class)?

    b.    Do Defendants charge ABK's fees to pretrial defendants without findings of guilt, without an opportunity to contest the fees, without notice, and without counsel (pretrial subclass)?

---

[5] For example, in 2021 alone, nearly 11,000 criminal cases were filed in Vanderburgh County. Almost 24% of cases are dismissed, meaning that those cases for certain are in pretrial stages, though others are likely in pretrial stages as well. Twenty-four percent of 11,000 is 2,640 cases. In 2021, there were also over 15,000 pending criminal cases from prior years. *Indiana Trial Court Statistics by County, Vanderburgh County (2021 Activities)*, Public Access, https://publicaccess.courts.in.gov/ICOR/ (last viewed July 1, 2022).

     c.     Do Defendants condition pretrial defendants' release on payment of ABK's fees on an ongoing, indefinite basis, without considering ability to pay and on top of and separate from any bail amount (pretrial subclass)?

     d.     Do Defendants punish those who cannot afford ABK's fees, in the form of threats, arrests, revocation requests, incarceration, and reduced sentencing options (indigent subclass)?

     e.     Does ABK, without judicial review, order local law enforcement to arrest and incarcerate those unable to pay its fees (indigent subclass)?

     f.     Have Defendants come to an agreement to charge supervisees ABK fees on penalty of incarceration (main class)?

202.    Common issues of law include:

     a.     Do Defendants have an unconstitutional conflict of interest by having both a financial stake in ABK's fees and the power to alter supervision conditions so as to set those fees?

     b.     Do Defendants violate due process by requiring pretrial defendants to pay ABK's fees, under penalty of incarceration?

     c.     Do Defendants violate due process by conditioning pretrial defendants' liberty on ongoing payment of ABK's fees, as a form of quasi-bail?

     d.     Do Defendants violate equal protection by discriminating against supervisees too poor to afford ABK's fees by targeting them with threats, arrest, revocation requests, incarceration, and fewer sentencing options?

     e.     Do Defendants create debtors' prisons in violation of due process by incarcerating those too poor to afford ABK's fees?

     f.     Does ABK falsely imprison supervisees by having supervisees who cannot afford ABK's fees arrested and detained?

     g.     Have Defendants conspired to violate supervisees' constitutional rights by having an agreement to incarcerate supervisees who cannot afford ABK's fees, without considering ability to pay?

## C.    Typicality — Fed. R. Civ. P. 23(a)(3)

203.    All Plaintiffs are subject to ABK fees. Plaintiffs are members of both the class and at least one subclass (Plaintiff Huggins is a member of the indigent subclass and Plaintiff Miller is a member of the pretrial subclass). Plaintiffs have been injured in the same way as the other members of the class and subclass. Plaintiffs' claims are typical of the proposed class and subclass members; indeed, they are identical.

204.    All class members are charged ABK's fees.

205.    All class members must continue to pay ABK's fees without notice as to how long — and therefore how much — they will have to pay in fees.

206.    All class members are charged ABK's fees without consideration of their ability to pay these fees.

207.    All pretrial subclass members are charged ABK's fees while legally innocent.

208.    All pretrial subclass members must pay ABK's fees as an extension of their bail amounts; all pretrial subclass members must pay ABK's fees to stay out of jail.

209.    All indigent subclass members are denied fee waivers and reductions in ABK's fees.

210.    All class members are subject to incarceration if they do not pay ABK's fees and indigent subclass members are subject to incarceration because of their inability to afford ABK's fees.

### D.    Adequacy — Fed. R. Civ. P. 23(a)(4) and 23(g)

211.    Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs have no claim antagonistic to those of the Class. In support of this proposition, Plaintiffs would show that:

- Plaintiffs are members of the proposed class and at least one of the sub-classes;
- Plaintiffs are interested in representing the proposed class and sub-classes;
- Plaintiffs have no interest adverse to the rest of the class and sub-classes; and
- Plaintiffs have suffered the same harm as the proposed class and sub-classes.

212.    Class counsel will also fairly and adequately represent the interests of the class. Plaintiffs are represented by attorneys from Equal Justice Under Law and Schnepper Law. Equal Justice Under Law attorneys have experience in litigating complex civil rights matters in federal

court, particularly with regards to wealth-based discrimination. Schnepper Law attorney Jeremy Schnepper is experienced in Indiana federal and local courts, having represented clients in civil rights, criminal, and personal injury matters. Class counsel has extensive knowledge of the relevant constitutional and statutory law. Class counsel also have a detailed understanding of state law and county practices as they relate to federal constitutional requirements.

213.    Counsel have devoted significant time and resources to become intimately familiar with how Vanderburgh County's private fee scheme works in practice. Counsel have also developed relationships with some of those victimized by Defendants' practices. The interests of the class members will be fairly and adequately protected by the Plaintiffs and their attorneys.

### E.    Predominance and Risk of Inconsistent Adjudications — Fed. R. Civ. P. 23(b)(1)

214.    The common questions of fact and legal issues applicable to each individual member of the proposed class are identical. The prosecution of separate suits by individual members of the proposed class would create a risk of inconsistent adjudications of the legal issues and would establish incompatible standards of conduct for any party opposing the class. Common questions of law or fact predominate over any questions affecting only individual class members. Nothing short of a universally-applied remedy to all members of the class would address the allegations set forth in this complaint.

### F.    Injunctive and Declaratory Relief and Damages — Fed. R. Civ. P. 23(b)(2)–(3)

215.    The class seeks injunctive and declaratory relief under Rule 23(b)(2) to enjoin Defendants from operating its ABK fee scheme, specifically as to charging fees and detaining class members for failure to pay fees. Such injunctive and declaratory relief is appropriate because Defendants have acted in the same unconstitutional manner with respect to all class members (including subclass members) and an injunction and declaration prohibiting Defendants from

charging fees would provide relief to every class (and subclass) member. While subclass members have a few additional claims as to why Defendants' fee scheme is unconstitutional as compared to class members, the injunctive and declaratory relief requested would provide relief to everyone, class and sub-class members alike, because such relief would end Defendants' fee scheme, which injures all class members.

216.    The class also seeks declaratory relief under Rule 23(b)(2) as to Defendant Judge Kiely. The class seeks a declaratory judgment barring Defendant Judge Kiely from continuing to authorize and enforce the ABK fee scheme.

217.    The class also seeks damages from ABK for the fees that they have been unconstitutionally charged and for which they have paid.

218.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy. All class and subclass members are subject to ABK's fees. Individual adjudications would be inefficient (not in the least because the likely recovery of any individual class member would be swallowed up by litigation costs) and risk inconsistent rulings, even though every adjudication would turn on the same policies — namely, Defendants' policy of allowing ABK exclusive control of electronic monitoring and drug and alcohol testing in Vanderburgh County, allowing ABK to set its own fees, allowing all Defendants to financially benefit from ABK's fees, and allowing incarceration for non-payment of ABK's fees.

219.    This case is far more manageable as a class action than as individual adjudications because of the common issues of fact and law, which prevail over any minor individual differences among class members. Thus, certification under Rule 23(b)(3) is also appropriate.

## CLAIMS FOR RELIEF

### Count One: Violation of Procedural Due Process for Financial Conflict of Interest
### (on behalf of all class members against all Defendants)

41

220.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

221.    Due process prohibits neutral judicial and law enforcement officials from having a financial interest in the outcome of their cases.

222.    Defendants have a financial interest in ABK's fees because ABK profits from its fees and a portion of ABK's fees pay for Vanderburgh County probation staff salaries and court operations.

223.    Because all Defendants have a financial interest in ABK's fee scheme, Defendants violate due process.

**Count Two: Violation of Procedural Due Process Regarding Deprivation of Property Interest in Fee Amount (on behalf of the pretrial subclass against all Defendants)**

224.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

225.    By charging pretrial defendants fees without any finding of guilt, Defendants deprive pretrial defendants of their property without due process as guaranteed under the Fourteenth Amendment.

**Count Three: Violation of Procedural Due Process for Arbitrary Bail (on behalf of the pretrial subclass against all Defendants)**

226.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

227.    Pretrial fees are imposed as quasi-bail, yet without the attendant due process protections. Defendants have authorized and implemented a pretrial fee scheme whereby pretrial defendants must pay ABK's fees without evaluating pretrial defendants' ability to afford the fees prior to charging the fees, incarcerating pretrial defendants when they cannot afford the fees, and subjecting pretrial defendants to the fees for indeterminate periods.

### Count Four: Violation of Equal Protection for Wealth-Based Discrimination
### (on behalf of the indigent subclass against all Defendants)

228.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

229.    The Fourteenth Amendment's Equal Protection Clause prohibits outcomes in the carceral system from turning on a person's ability to make a monetary payment.

230.    Defendants treat similarly-situated individuals — criminal defendants — differently based on whether they are indigent. Indigent defendants are subject to threats, arrest, revocaton requests, incarceration, and fewer sentencing options *because of* their poverty.

231.    This wealth-based discrimination is prohibited by the Equal Protection Clause of the United States Constitution.

### Count Five: Violation of Due Process for Debtors' Prisons
### (on behalf of the indigent subclass against all Defendants)

232.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

233.    The Fourteenth Amendment's Due Process Clause prohibits outcomes in the carceral system from hinging on a person's ability to make a monetary payment.

234.    Under Defendants' fee scheme, criminal defendants in Vanderburgh County can be incarcerated for inability to pay ABK's fees. Such debtors' prisons violate due process.

### Count Six: False Imprisonment
### (on behalf of the indigent subclass against Defendants ABK)

235.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

236.    Defendant ABK unlawfully orders the arrest of criminal defendants who cannot afford ABK's fees.

237.    Such unlawful and involuntary restraint of criminal defendants amounts to false imprisonment.

### Count Seven: Conspiracy to Violate Constitutional Rights
### (on behalf of all class members against all Defendants)

238.    Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

239.    Defendants have conspired to deprive Plaintiffs and criminal defendants in Vanderburgh County of their constitutional rights by forcing them to pay money on penalty of incarceration.

### REQUEST FOR RELIEF

240.    WHEREFORE, Plaintiffs demand a jury trial and the following relief: Plaintiffs, the class, and the subclasses they represent have suffered damages, for which they seek recovery from Defendants:

a.      A declaratory judgment that Vanderburgh County's contract with ABK, as orchestrated by Judge Kiely, is unlawful;

b.      A declaratory judgment that Defendants' ongoing policy of denying electronic home detention as a sentencing option to indigent defendants is unlawful;

c.      An order and judgment preliminarily and permanently enjoining Defendants from continuing the above-described unlawful fee scheme;

d.      A judgment ordering Defendants Vanderburgh County and Kiely to train all law enforcement and court employees on the above-mentioned preliminary and permanent injunctions;

e.      A judgment compensating Plaintiffs and the Class of similarly-situated

individuals for the damages that they suffered as a result of Defendants' unconstitutional

and unlawful conduct, specifically all fees paid to Defendant ABK;

f.        An order and judgment granting reasonable attorneys' fees and costs pursuant

to 42 U.S.C.  §§ 1983 and 1988;

g.        An order and judgment granting pre- and post-judgment interest;

h.        And any other relief this Court deems just and proper.

Respectfully submitted,

/s/ Phil Telfeyan
Phil Telfeyan
Natasha Baker*
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
nbaker@equaljusticeunderlaw.org
*petition to appear pro hac vice forthcoming

/s/ Jeremy Schnepper
Jeremy Schnepper
Schnepper Law
4 N.W. 2nd Street, Suite 3
Evansville, IN 47708
(812) 492-1901
jwschnepper@outlook.com

Attorneys for Plaintiffs

## Exhibit List

Exhibit 1 …………………..……………………….…. Courier & Press Article Oct. 25, 2021

Exhibit 2 …………………….…...…………………….. Excerpt from Deposition Transcript

of Danny Koester in *State of Indiana v. Hillgoth*, Vanderburgh Superior Court (Jan. 25, 2021)

Exhibit 3 ……………….………………………………... Declaration of William Huggins

Exhibit 4 ………………….………………………………………...… Sample ABK Contract

Exhibit 5 …………………….….. Sample Petition to Revoke from Prosecutor Douglas Brown

Exhibit 6 ……………….……………………………...… Courier & Press Article Nov. 4, 2021

Exhibit 7 ……………….………………………………….…. Declaration of Keith Miller

Exhibit 8 ………………………..…………….. ABK Violation Report for David Carney

Exhibit 9 …………………...…….…..…. March 29, 2022 Petition to Revoke for Plaintiff Huggins

Exhibit 10 …………..…………… March 29, 2022 ABK Violation Report for Plaintiff Huggins

Exhibit 11 ……………….…... Sample Petition to Revoke from Probation Officer Warren Hale

Exhibit 12 …………………….…... Sanctions List for ABK Offender Accountability Program

Exhibit 13 ………………….…….... May 17, 2022 Petition to Revoke for Plaintiff Huggins